[Dkt. Nos. 1, 4, 13]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

| | |
|---|---|
| CINNAMINSON TOWNSHIP BOARD OF EDUCATION, | |
| Plaintiff, | Civil No. 16-3586 (RMB/KMW) |
| v. | **OPINION** |
| K.L. o/b/o R.L., | |
| Defendant. | |

APPEARANCES:
Eric L. Harrison
Methfessel & Werbel, Esqs.
2025 Lincoln Highway, Suite 200
Edison, NJ 08818
    *Attorney for Plaintiff-Counterclaim Defendant*

Catherine Merino Reisman
Sarah E. Zuba
Reisman Carolla Gran LLP
19 Chestnut Street
Haddonfield, NJ 08033
    *Attorneys for Defendant-Counterclaim Plaintiff*

**BUMB**, UNITED STATES DISTRICT JUDGE:

This matter comes before the Court after a ruling by

Administrative Law Judge Ascione (the "ALJ") concerning a "stay-

put" placement for Defendant K.L. o/b/o R.L. ("K.L." or

"Defendant") and funding of that placement.  After that ruling,

Plaintiff Cinnaminson Township Board of Education ("Cinnaminson"

or "Plaintiff") initiated this action by the filing of a

verified complaint, (Compl. [Dkt. No. 1]), accompanied by an order to show cause seeking interlocutory appeal from the ALJ's order concerning funding of the "stay-put" placement, (Proposed Order to Show Cause [Dkt. No. 1-2].)[1]  On June 22, 2016, Defendant answered the verified complaint and counterclaimed for relief in the form of a preliminary and permanent injunction requiring funding of the that placement.  (Ans. [Dkt. No. 3]; Motion for Preliminary Injunction [Dkt. No. 4].)  Finally, Plaintiff cross-moved to dismiss the counterclaim and, in the alternative, moved for a preliminary injunction pending any review by the United States Court of Appeals for the Third Circuit of this Court's decision.  (Cross-Motion to Dismiss [Dkt. No. 13].)

     As set forth below, the Court finds that the June 6, 2016 Order of the ALJ directing a stay-put placement and funding should be REVERSED and VACATED.  As such, Plaintiff's cross-motion to dismiss Defendant's request for injunctive relief is GRANTED.  Because this Court does not find a funding obligation

---

[1] The order to show cause also contained temporary restraints staying the order entered by the ALJ, pending briefing by the parties on the underlying merits of Plaintiff's verified complaint.  After a telephone conference on June 22, 2016, Plaintiff submitted a joint proposed order containing temporary restraints and a briefing schedule, which was entered by this Court on June 23, 2016.  (June 23, 2016 Order [Dkt. No. 9].)

exists given the disposition of the interlocutory appeal, Plaintiff's request for injunctive relief is DENIED.

I.   <u>**BACKGROUND**</u>

  A. <u>**Factual Background**</u>

R.L. is the thirteen-year-old daughter of Defendant K.L. and is eligible for "special education and related services" under the Individuals with Disabilities Education Act (IDEA). (Compl. ¶ 1; Answer ¶ 1.)  During the 2013-14 school year, Defendant lived with her daughter in Berlin Borough Township, where R.L. attended The Quaker School at Horsham ("TQSH"), a private school, beginning in February 2014.  (Compl. ¶ 2 & Ex. A; Answer ¶ 2.)  During that time period, a dispute arose between Defendant and Berlin Borough Township Board of Education ("Berlin") concerning R.L.'s placement at TQSH.  (Compl. Ex. A.) As a result of that dispute, Defendant filed a due process petition in the State of New Jersey Office of Administrative Law.  (<u>Id.</u>)  Thereafter, the parties entered into a settlement agreement and release, which is attached to the verified complaint as Exhibit A (the "Berlin Settlement"). (<u>Id.</u>)

The Berlin Settlement, executed October 28, 2014, resolved the issues involved in the Due process Petition filed by Defendant against Berlin.  (<u>Id.</u>)  Specifically, Berlin paid Defendant $51,799 for Defendant's "expenses, reimbursements or compensation in this matter", including a payment to TQSH for

tuition and payment to a school R.L. had attended prior to TQSH. (Id.)  The agreement also required Berlin to write an Individualized Education Program ("IEP") for R.L. that placed her at TQSH for the 2014-15 school year.  (Id.)  In so doing, Berlin did not admit "any deficiencies in the program and placement previously offered by [Berlin] to R.L." (Id. at 6.)

Notwithstanding the parties having agreed to an IEP to place R.L. at TQSH for all of 2014-15, and their agreement that the settlement agreement would "cover[] the 2014-2015 school year for as long as R.L. is a resident of Berlin," the Berlin Settlement only provided funding intended to pay for the months of September and October 2014.  (Id. at 2.)  This appears to be because Defendant also agreed "to relocate herself and R.L. [] from Berlin Borough no later than October 31, 2014," a mere three days after the Berlin Settlement was executed.  (Id. at 7, 10.)  Defendant also agreed "not to relocate back to Berlin Borough's jurisdiction in the future."  (Id. at 7.)  The Berlin Settlement notes, "In the event such relocation does not take place by October 31, 2014, the Board will nonetheless have no further obligations to K.L., R.L., and/or C.L."[2]  (Id. at 7.)

---

[2] C.L. is another of K.L.'s children.  While the Berlin Settlement does not seem tailored to C.L.'s needs, the agreement recognized "there is a potential claim against the Board regarding C.L.'s [Free and Appropriate Public Education ("FAPE")].  This Settlement Agreement and Release equally

Another provision of the Berlin Settlement required that "The Settlement Agreement and Release shall be incorporated into a Final Decision and Order by an Administrative Law Judge." (Id. at 9.)  In keeping with that provision, it was approved on November 21, 2014 by ALJ Delanoy in the State of New Jersey Office of Administrative Law. (Id. at 1-3.)  That approval, however, placed no imprimatur on the propriety of R.L.'s placement at TQSH, as Judge Delanoy noted, "the settlement terms do not require that I approve the placement itself, nor do I via this decision." (Id. at 2.)

Consistent with the provisions of the Berlin Settlement, K.L. exiled herself from Berlin, ultimately taking root in Cinnaminson Township.  Thereafter, she registered R.L. as a student with Cinnaminson on October 31, 2014, and provided Cinnaminson with the IEP Berlin prepared as part of the Berlin Settlement.  (Compl. ¶ 11; Ans. ¶ 11.)   Cinnaminson — which was not a party to the Berlin Settlement — did not agree to adopt Berlin's IEP.  Cinnaminson, however, did not provide a new IEP to R.L.  When K.L. had not been provided with a new IEP proposal from Cinnaminson by December 15, 2014, Defendant "filed a petition for due process seeking funding of the TQSH placement." (Counterclaim Compl. ¶ 14; Ans. ¶ 12; Compl. ¶ 12; Counterclaim

applies to any potential claim that could be filed regarding C.L.'s FAPE."

Ans. ¶ 14.)  Ultimately, Cinnaminson and K.L. agreed to settle this dispute and on February 25, 2015, the parties entered in an agreement ("the Cinnaminson Settlement") which required that Cinnaminson pay for R.L.'s placement at TQSH through June 30, 2015.  (Compl. Ex. C.)  Importantly, the Cinnaminson Settlement also stated that it "does not establish the last agreed-upon placement for the purposes of the 'freeze' or 'stay-put' provision of the IDEA," and that "both parties expressly reserve all rights and remedies on the issue of stay-put" possessed when K.L. filed for emergent relief on December 15, 2014.  (Id. at 7.)[3]

After paying for R.L.'s attendance at TQSH and in keeping with their obligation under the Cinnaminson Settlement, on June 3, 2015 Plaintiff proposed a new IEP placing R.L. in public school for the 2015-16 school year.  (Compl. ¶13; Answer ¶13.) K.L. contested this placement's ability to provide R.L. with a FAPE, and filed a petition with the Office of Special Education Programs on June 16, 2015, seeking an order supporting K.L.'s assessment of the Cinnaminson IEP's inadequacy. (Compl. ¶14; Answer ¶14.)  Over a year later, this action is still pending. (Compl. ¶15; Answer ¶15.)

---

[3] As discussed at oral argument, it appears the purpose of the Cinnaminson Settlement was to afford time for Plaintiff to complete an IEP for R.L.

B. **Procedural Background**

Subsequent to the June 2015 petition regarding Cinnaminson's IEP for the 2015-16 school year, K.L. filed an application for emergent Relief, asking the court to require Cinnaminson to "fund R.L.'s placement at TQSH pending the outcome" of K.L.'s petition, pursuant to the "stay-put" provision of 20 U.S.C. § 1415(j).  (Compl. ¶19; Ans. ¶19.) Judge Ascione ruled on the merits of this application on June 6, 2016, and ordered Cinnaminson to reimburse K.L. for "the costs of tuition and transportation for R.L.'s placement at TQSH for the 2015 Extended School Year and the 2015 – 2016 school year" within ten days, as well as "arrange to continue financial support of the placement pending the Final Decision" on K.L.'s petition of the Cinnaminson IEP.  (Compl. Ex. D.)

As noted at the outset of this Opinion, on June 20, 2016, Cinnaminson filed a verified complaint in support of an order to show cause seeking interlocutory appeal requesting that this court issue an order reversing the June 6, 2016 Order of Judge Ascione and ruling that Cinnaminson is not required to fund the costs of R.L.'s placement at TQSH.  (Compl. ¶ 14-15.)  On June 22, 2016 K.L. filed an answer to Cinnaminson's verified complaint, requesting that the Court deny Cinnaminson's request, as well as a counterclaim requesting that the Court affirm Judge Ascione's decision determining that TQSH is R.L.'s stay-put

7

placement, issue preliminary and permanent injunctive relief whereby Cinnaminson pays for R.L.'s placement at TQSH until the pending matter before Judge Ascione is resolved, and award attorney fees to K.L.  (Ans. ¶ 15.)

The parties agreed to stay Judge Ascione's June 6, 2016 Order pending a decision on the Cinnaminson's appeal and the respective applications for injunctive relief presently pending before the Court.  (Order [Dkt. No. 9].)  On July 1, 2016 Cinnaminson filed an answer to K.L.'s counterclaim, as well as a motion to dismiss the counterclaim.  (Pl.'s Ans. to Counterclaim [Dkt. No. 12]; Cross-Motion [Dkt. No. 13].)  K.L. responded with a brief in opposition of Cinnaminson's motion to dismiss, as well as in furtherance of their initial request for injunctive relief.  (Def.'s Opp. Br. [Dkt. No. 15].)  On July 20, 2016 oral argument was held before the Court, during which the parties consented to have the injunctive relief converted to a request for final injunction and agreed to have the Court decide all issues on the arguments without the introduction of further evidence.

## II.  <u>JURISDICTION AND STANDARD OF REVIEW</u>

The District Court has federal subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331.  Although the stay-put provision has no express language concerning appeal to a district court from an ALJ determination, <u>R.S. v. Somerville</u>

Board of Education, 2011 WL 32521, at *8 (D.N.J. Jan. 5, 2011), "[o]ur courts . . . accept jurisdiction of stay put disputes, and the Court of Appeals has expressed no concern about the jurisdictional basis." Id. (citing Drinker v. Colonial School Dist., 78 F.3d 859, 860 (3d Cir. 1996)).

With regard to IDEA, courts apply a modified de novo review standard to appeals from ALJ findings. L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 389 (3d Cir. 2006); In re Educ. Assignment of Joseph R., 318 Fed. Appx. 113, 117 (3d Cir. 2009) ("A district court must review an IDEA decision by a state administrative agency under a modified de novo standard."). This standard of review provides due weight to factual findings by the ALJ, but allows for de novo review of issues of law. Joseph R., 318 Fed. App'x at 117 ("A district court must review an IDEA decision by a state administrative agency under a modified de novo standard."). As other courts in this District have noted, "a stay put decision [is] a legal question as established in the case law." R.S., 2011 WL 32521, at *8. Here, the operative facts before the Court are not in dispute. As such, the legal questions pertaining to the "stay-put" decision are reviewed by this Court de novo.

With regard to the posture of the review, courts in this District have also been willing to address stay-put decisions on an interlocutory basis. M.K. v. Roselle Park Bd. of Educ., 2006

WL 3193915, at *8 (D.N.J. Oct. 31, 2006) ("While this Court can locate no authority expressly addressing the implications of the ripeness doctrine on this Court's jurisdiction to enjoin stay-put orders entered by an ALJ, the weight of authority indicates that district courts have the power to review and enjoin ALJ stay-put orders immediately, notwithstanding the fact that they are interim orders.")[4]  As such, this Court properly reviews the ALJ's stay-put determination on an interlocutory basis.  See id. (reviewing interlocutory appeal from stay-put decision).

**III.  DISCUSSION**

  **A. R.L.'s "Stay-Put" Placement**

     IDEA sets forth a variety of safeguards to protect the interests of special needs children.  One of the most prominent

---

[4] The Third Circuit has noted that denying a school district the opportunity to test the legal validity of a stay-put order on an interlocutory appeal—albeit from a district court stay-put order—presents the school district with the realistic proposition that they may outlay costs which can never be recouped if the school district is vindicated.  Solin v. Riverton Borough Bd. of Educ., 143 Fed. Appx. 491, 492-93 (3d Cir. Aug. 15, 2005) ("Had the school district been denied interlocutory review until the District Court issued its final order on the merits of the IDEA action, the school district's ability to legally test the validity of the stay-put order and to avoid the concomitant and continuing financial obligations would have been impossible.  Appellate review at the termination of all district court proceedings might impair the school district's ability to recoup some or all of the funds it continued to expend in compliance with the stay-put order. Interlocutory review had the potential of avoiding this result . . . .").  That same concern appears present to this Court as well on an appeal from an ALJ determination.

of these safeguards is contained in 20 U.S.C. § 1415(j), often referred to as the "stay-put" provision.  20 U.S.C. § 1415(j) (2012).  This section provides that a child is to remain in their "then-current educational placement" during the "pendency of any proceedings conducted pursuant to [IDEA]." Id.  This portion of IDEA refers to both the services and funding included in the placement, mandating that "a school district continues to finance an educational placement made by the agency and consented to by the parent before the parent requested a due process hearing." Drinker, 78 F.3d at 865 (quoting Zvi D. by Shirley D. v. Ambach, 694 F.2d 904, 906 (2d Cir. 1982)).

    The "stay-put" provision acts as "an automatic preliminary injunction," barring schools from making changes to a disabled student's education without parental consent.  Drinker, 78 F.3d at 864. The fact that IDEA applies this injunction automatically, and does not consider "the usual prerequisites of injunctive relief" such as "whether [the parent's] case is meritorious or not," demonstrates the high priority that Congress intended to give to the continuity of student services under IDEA.  Id. (quoting Woods v. New Jersey Dep't of Educ., No. 93-5123, 20 Indiv. Disabilities Educ. L. Rep. 439, 440 (3d Cir. Sept. 17, 1993)).  The Supreme Court has noted that this protection is "unequivocal" with the purpose of "strip[ping] schools of the unilateral authority they had traditionally

employed to exclude disabled students . . . from school."
Drinker, 78 F.3d 859, 864 (3d Cir. 1996) (emphasis in original)
(quoting Honig v. Doe, 484 U.S. 305, 323 (1988)).

While the "stay-put" provision is an important procedural
safeguard for special education students, it is not the only
safeguard contained in IDEA, nor does it apply in every
situation where a parent and school district have a dispute.
Michael C. v. Radnor Tp. School Dist., 202 F.3d 642, 651 (3d
Cir. 2000) ("[W]here a parent unilaterally removes a child from
an existing placement . . . the protections of the stay-put
provision are inoperative"); see also J.F. v. Byram Tp. Bd. Of
Educ., 629 F.App'x 235, 238 ("[T]he stay-put provision yields to
other procedures governing [student] transfers").  When a parent
unilaterally moves a child to a new school district, the "stay-
put" provision is not applicable and a different section of the
IDEA applies: 20 U.S.C. § 1414 (d)(2)(C)(i).  J.F., 629 Fed.
App'x at 238 (holding that when a student transfers between
school districts in the same state "the stay-put provision is
inoperative" and a school district "meets its obligation by
complying with § 1414(d)(2)(C)(i)(I)").  While this means a
child does not receive the exact continuity that a "stay-put"
placement provides, a new school district is still required to
provide the child with a "free appropriate public education,
including services comparable to those described in the

previously held IEP," until a new IEP is agreed upon.  20 U.S.C.
§ 1414 (d)(2)(C)(i) (2004).

The reason that the "stay-put" provision becomes
inoperative after a student moves is because "the purpose of the
stay-put provision, which is to maintain the status quo in
situations where the school district acts unilaterally, is not
implicated." J.F., 629 F. App'x at 237 (citing Ms. S. v. Vashon
Island Sch. Dist., 337 F.3d 1115, 1133 (9th Cir. 2003)
("Although the 'stay-put' provision is meant to preserve the
status quo, we recognize that when a student transfers
educational jurisdictions, the status quo no longer exists")).
Therefore, the use of 20 U.S.C. § 1414 (d)(2)(C)(i), instead of
"stay-put" placements, balances the goal of maintaining
educational consistency for special needs students with the
recognition that families have accepted some amount of
discontinuity in their child's education when they voluntarily
change school districts.

The Third Circuit has recognized that this rule could "bind
the hands" of parents who believe their transfer student
requires private school services, but must accept comparable
public school services because they do not have the ability to
"pay private school tuition out-of-pocket and await future
reimbursement." Michael C., 202 F.3d at 652. However, the Third
Circuit concluded that this "appears to be an unfortunate

13

reality of the system Congress created." Id. They also note that the time period under which this "unfortunate reality" exists is limited by other safeguards, "as federal and state regulations impose strict timing requirements" on the implementation of IEPs and adjudication of due process hearings. Id.

In 2000, the Third Circuit first explicitly held that a student's voluntary relocation invalidated their "stay-put" placement, and put them under the protection of the "comparable services" requirement of 20 U.S.C. § 1414 (d)(2)(C)(i). Michael C., 202 F.3d at 642. In that case, Michael was a student living in Washington D.C. and attending private school there, pursuant to an IEP created by that school district. Id. at 646. He later moved with his father to Radnor Township in Pennsylvania. Id. Radnor Township offered him two interim placements in public schools, which Michael's father rejected. Id. He instead placed Michael in a private school in the area. Id. The family moved again shortly after this placement, however Michael's father sought reimbursement from Radnor Township for the month that Michael spent in private school. Id. He argued that the "stay-put" provision required Radnor Township to implement the IEP created by Washington D.C., as it was Michael's last functioning educational placement. Id. at 646-47.

The local hearing officer, appeals panel, district court, and eventually the Third Circuit all rejected the father's argument.  Id. at 648.  The lower courts all agreed that IDEA was silent on the question of whether or not the "stay-put" provision applied to a student who transfers from out of state. Id.  Therefore, they looked to a policy memorandum from the United States Department of Education's Office of Special Education Programs ("OSEP") which stated that "when a disabled student moves from one state to another, the new state of residence is not required to adopt and implement the most recent IEP developed for the student by the previous state of residence."  Id. at 647.  After looking to the purpose of the "stay-put" provision ("preventing local educational authorities from unilaterally changing a student's existing educational program") and the fact that "where a parent unilaterally removes a child from an existing placement" that purpose is no longer at issue, the court held that "IDEA's overall scheme and the precedent interpreting that scheme leads inexorably to the conclusion that when a student moves from State A to State B, any prior IEP in effect in State A need not be treated by State B as continuing automatically in effect." Id. at 650-51.

A panel of the Third Circuit later confronted this issue with regard to intrastate transfers in J.F. v. Byram.  J.F., 629

F. App'x 238.[5]  J.F. was a disabled student living in Westwood Township who had an IEP that placed him at the Craig School, a private institution.  Id. at 236.  When J.F. moved to Byram Township and presented the IEP to the school district, the township asserted they would be able to implement an in-district program and would not need to place J.F. in a private school. Id.  J.F.'s parents disagreed with this assessment and during the subsequent proceedings to determine if Byram Township could provide a FAPE in-house, J.F.'s parents petitioned for the township to pay for J.F.'s placement at the Craig School pursuant to the "stay-put" provision of IDEA.  Id.  Focusing on the fact that "J.F.'s parents unilaterally relocated from Westwood to Byram" and that "the purpose of the stay-put provision . . . [was] not implicated" the panel held that "the stay-put provision [was] inoperative and Byram [met] its obligation by complying with § 1414(d)(2)(C)(i)(I)."  Id. at 238.

This is not to say that no situation exists where a "stay-put" placement will be carried from one state entity to another. In Pardini v. Allegheny Intermediate Unit, the Third Circuit held a school district to a "stay-put" placement created by the

---

[5] The Court does note that J.F., pursuant to the Third Circuit's instruction, "is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent."  The Court nevertheless finds the reasoning pertinent to this discussion.

Alliance for Infants and Toddlers ("AIT"), a state agency that
provided services to pre-school aged children with special
needs.  Pardini v. Allegheny Intermediate Unit, 420 F.3d 181 (3d
Cir. 2005).  Pardini was receiving services through an AIT-
generated Individualized Family Service Plan ("IFSP").  Id. at
182.  When she turned three, she was to transition from her IFSP
to an IEP produced by the school district, but a dispute arose
between the school district and the parents as to the necessity
of certain services.  Id. at 182-84.  During the pendency of
that proceeding, the parents argued that Pardini's "stay-put"
placement should be the services she was receiving under the
IFSP.  Id. at 184.  The district court disagreed, stating that
"the stay-put rule of § 1415(j) does not apply to a child who
has reached her third birthday and is therefore transitioning
from an IFSP to an IEP."  Id.  The Third Circuit reversed,
stating the importance that congress placed on a "smooth
transition" between IFSPs and IEPs under IDEA dictated that
AIT's IFSP act as a "stay-put" placement.  Id. at 191.  This
holding demonstrates a judicial willingness to bind state
agencies to the decisions of others, when the transition between
the two is not spurred by the voluntary act of the family.

     Unlike Pardini, R.L.'s voluntary decision to move between
school districts, like those made in J.F. and Michael C., acted
as waiver of her right to a "stay-put" placement, and instead

put her under the protection of 20 U.S.C. § 1414

(d)(2)(C)(i)(I).[6] As a result, Cinnaminson was and is required to

provide R.L. with comparable services to the IEP issued by

Berlin, but is not required to fund R.L.'s placement at TQSH.

K.L. argues that because Judge Ascione made a factual

finding that Berlin's IEP and placement of R.L. at TQSH

constituted a "then-current educational placement," the IEP

should be carried over to Cinnaminson with full force.  Even

assuming K.L. is correct and that is a factual finding to which

this Court must afford "due weight," that factual finding itself

is not implicated by this Court's decision, nor does it mean the

ALJ's findings cannot be contested.  Shore Regional High School

Bd. Of Educ. v. P.S. ex rel. P.S., 381 F.3d 194, 199 (3d Cir.

2004) (quoting Westchester County v. Rowley, 458 U.S. 176, 206

(1982)).  The "modified de novo" standard requires that if the

court "fails to adhere" to the ALJ's factual findings, "it is

obliged to explain why." Id. (quoting S.H. v. State-Operated

---

[6] K.L. provides two other cases which support the proposition
that Congress prioritizes continuity of services over other
concerns. M.R. v. Ridley School Dis., 744 F.3d 112, 127-28 (3d
Cir. 2014) (stating that the "stay-put" provision demonstrates a
"concern about the continuity of a child's placement generally"
in addition to its concern about schools making unilateral
decisions regarding special education services); R.S., 2011 WL
32521 at *10 (approving a stay-put placement). However, neither
of these cases dealt with the situation currently before the
Court, in which the family voluntarily disrupted the child's
educational placement by moving into another district.

School Dis. Of City of Newark, 336 F.3d 260, 271 (3d Cir.
2003)).  In this instance, Judge Ascione found that the IEP
issued by Berlin placing R.L. at TQSH created a "stay-put"
placement on October 28, 2014.  (Compl. Ex. D at 9 ("This
settlement agreement with Berlin created a functional IEP
placing R.L. at TQSH on October 28, 2014 . . . .  TQSH became
R.L.'s appropriate pendant placement for stay put purposes [on
that date.]").)  The Court takes no issue with that determination
as of October 28, 2014.  However, the opinion makes no mention
of the impact of the subsequent unilateral move made by R.L. to
a different school district - indeed, it ignores the well-
established statutory effect that such a move has on a student's
right to any "stay-put" placement.  As such, this Court's
holding does not disregard the factual finding of the ALJ
concerning R.L.'s "stay-put" location on October 28, 2014.
Instead, this Court holds that the stay-put decision, as applied
after the move to Cinnaminson, was erroneous because it failed
to note that this was a situation in which "the stay put
provision yields to other procedures."  J.F., 629 Fed. App'x at
238.  This issue is a legal one, ripe for de novo review by this
Court.  R.S. 2011 WL 32521, at *8 ("[A] stay put decision [is] a
legal question as established in the case law.").

        Put differently, the fact that Judge Ascione determined
that Berlin's placement of R.L. at TQSH constituted her "stay-

put" placement does not conflict with the Third Circuit's clear instruction, which states that a student loses her "stay-put" protection when she voluntarily moves from one school district to another.  Therefore, Cinnaminson will be in compliance with IDEA as long as it provides "comparable services" to those provided for in the Berlin IEP until the pending matter before Judge Ascione is resolved.  20 U.S.C. § 1414 (d)(2)(C)(i)(I).

## B. **Plaintiff's Failure to Generate an IEP**

The IDEA is considered an exercise in "cooperative federalism," setting up federal standards for special education, which states have great flexibility in implementing.  Schaffer v. Weast, 546 U.S. 49, 52 (2005).  While Congress gives the states "primary responsibility for developing and executing" special education programs, it "imposes significant requirements" that must be followed to stay complaint with IDEA.  Bd. of Educ. v. Rowley, 458 U.S. 176, 183 (1982).  Therefore, "[a]s long as a state satisfies the requirements of the IDEA, the state may fashion its own procedures."  Shore Regional High School Bd. Of Educ. v. P.S., 381 F.3d 194, 198 (3d Cir. 2004).

One such procedure is laid out in the New Jersey Administrative Code 6A:14-4.1, which deals with the implementation of § 1414(d)(2)(C)(i)(I). N.J.A.C. § 6A:14-4.1(g)(1) (2015). This section of the code tracks with IDEA, stating that transfer students from within the state must be

given "a program comparable to that set forth in the student's current IEP until a new IEP is implemented." Id. However, it goes a step further and states that this new IEP must be developed by the receiving school "within 30 days of the date the student enrolls in district." Id.

K.L. argues that when Cinnaminson failed to adhere to this section of the state regulations implementing IDEA, it defaulted to accepting Berlin's IEP as R.L.'s "stay-put" placement. To hold otherwise, she states, would encourage schools to withhold IEPs from transfer students, leaving them without any placement. This argument is problematic. First, K.L. does not cite to, nor can the Court find, any instance where a failure to offer a new IEP to a transfer student resulted in the creation of a "stay-put" placement. Second, K.L.'s argument – that not validating her proposed remedy would leave transfer students vulnerable to schools withholding services without repercussion – ignores the protections afforded by 20 U.S.C. § 1414 (d)(2)(C)(i).

It is imperative to stress that in no way is the Court suggesting that it is permissible for a school district to ignore mandates set forth in § 6A:14-4.1(g)(1). What this Court holds however, is that a breach of this regulation does not give the wronged party the leave to determine its own remedy without any basis in legislation or case law. What the breach does give the wronged party the right to do, however, is to file a

21

petition for emergent relief under New Jersey Administrative
Code 6A:3-1.6 seeking the provision of appropriate services.
N.J.A.C. § 6A:3-1.6 (2010).  And, indeed, this right is exactly
what K.L. exercised after 45 days had passed and Cinnaminson had
not provided an IEP or comparable services to R.L.  From that
petition a settlement agreement with Cinnaminson was formed,
which placed R.L. at TQSH, funded by Cinnaminson for the 2014-15
school year.  Thereafter, Cinnaminson provided an IEP for R.L.

K.L. also argues that to not hold Cinnaminson to the TQSH
placement after it violated its 30-day obligation would "create
a perverse incentive for school districts to simply ignore their
statutory obligations and offer no program at all, leaving a
student like R.L. with no stay put placement."  This false
ultimatum fails to account for the fact that K.L.'s own
unilateral move is what shifted R.L. from a "stay-put"
protection — an outcome courts have found acceptable.  Further,
K.L.'s argument again fails to acknowledge the alternate
protections afforded to R.L. by 20 U.S.C. § 1414 (d)(2)(C)(i).
Until an IEP could be agreed upon, Cinnaminson was required to
provide comparable services to R.L. under § 1414 (d)(2)(C)(i).
K.L. could have — **and did** — avail herself of the proper remedy
for the violation of that right by filing her previous due
process petition, which resulted in a settlement to stay at TQSH
for the 2014-15 year, with tuition paid by Cinnaminson from

November 2014 through June 30, 2015.  (Compl. ¶ 12 & Ex. D at 2;
Ans. ¶ 12.)

The Court recognizes that had K.L. not been able to afford
R.L.'s tuition at TQSH for the four months between R.L.'s
registration in Cinnaminson and the eventual settlement, this
may have placed R.L. without services for that period of time.
While this is not a desirable result, there are remedies for
such deprivations, such as "compensatory education," which is
available when "a student's substantive rights are affected by a
school district's non-compliance with the IDEA." <u>D.K. v.
Abington School Dist.</u>, 696 F.3d 233, 249 (3d Cir. 2012). While
it is never permissible for a school to be derelict in its
duties to the detriment of any child, let alone one with special
needs, IDEA lays out the appropriate remedies for these
breaches, and K.L. has been unable to provide persuasive
rationale for deviating from the network of safeguards and
balanced equities already inherent in the statute.[7]

---

[7] The Court is not dismissing the possibility that in the future
facts may present themselves where a school district shows such
complete disregard for its obligations under IDEA, that a lack
of belief that it would make a good faith effort to provide its
obligated "comparable services" would give the Court cause to
order a private school placement as a remedy for its breach of
duties. However, such facts are not present here.

### C. **Injunctive Relief**

As this Court finds it proper to reverse the determination of the ALJ, the Court accordingly denies all injunctive relief requested by the parties.  With regard to Defendant's request for injunctive relief ordering the enforcement of Judge Ascione's June 6, 2016 Order, in light of this Court's ruling on the interlocutory appeal reversing that order, granting Defendant's request would be improper.  As such, Plaintiff's cross-motion to dismiss that counterclaim requesting injunctive relief is granted.

With regard to Plaintiff's request for injunctive relief, that Court also finds the entry of such relief is unnecessary given the disposition of this case.  Plaintiff requests injunctive relief even if this Court should reverse Judge Ascione's June 6, 2016 Order because Defendant argues that <u>M.R. v. Ridley School District</u>, 744 F.3d 112 (3d Cir. 2014) nevertheless requires funding of even an erroneous stay-put determination.  Injunctive relief is not necessary because <u>Ridley</u> does not require Plaintiff to fund R.L.'s education at TQSH during the pendency of the due process petition.

<u>Ridley</u> concerned an action by parents seeking reimbursement for a private school placement at the conclusion of a prior legal proceeding challenging whether their daughter had received a FAPE.  <u>Id.</u> at 116.  In that prior action, an administrative

hearing officer had determined that the child had not been
provided a FAPE during a portion of her education, a conclusion
which was ultimately reversed by the district court.  Id.  The
Third Circuit affirmed the district court.  Id.  In the
subsequent reimbursement action, the Third Circuit determined
that the parents had a right to reimbursement during their legal
challenge of the IEP offered to their child through the Third
Circuit appeal, notwithstanding the fact that the district court
reversed the administrative hearing officer in ruling for the
school district.  Id. at 128.  Indeed, even the school district
did not challenge the stay-put placement itself, only the timing
by which the parents sought reimbursement for it and the time
period during which they were eligible for reimbursement.  Id.
at 123-24 ("Ridley admitted . . . that the court would have been
'obliged' to order reimbursement if the parents had sought the
funds through a timely counterclaim.").

   By contrast, this Court is not confronted with a school
district which consents to the determination of R.L.'s stay-put
placement and challenges the amount of reimbursement owed or
timing by which it must be sought.  Indeed, the very substance
of this interlocutory appeal is whether the ALJ properly
determined the stay-put location and corresponding funding
obligation at all.  Holding that stay-put funding is compulsory
regardless of this Court's determination on stay-put would

25

render that initial determination unreviewable or this Court's reversal ineffectual.

**IV.**   <u>**CONCLUSION**</u>

For the foregoing reasons, the Court REVERSES and VACATES the June 6, 2016 Stay-Put Order of ALJ Ascione.  The Court GRANTS Plaintiff's motion to dismiss Defendant's counterclaim for injunctive relief.  The Court DENIES the Plaintiff's request for injunctive relief.  An appropriate Order follows.


DATED:  August 9, 2016


<u>s/Renée Marie Bumb</u>
RENÉE MARIE BUMB
UNITED STATES DISTRICT JUDGE